UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EMMANUEL MITCHELL,

                  Petitioner,

    -vs-

VICTOR HERBERT,

             Respondent.

_____

**REPORT AND RECOMMENDATION
No. 01-CV-0681(JTE)(VEB)**

## I.      Introduction

Emmanuel Mitchell (""Mitchell" or "petitioner") has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 1997 conviction in Erie County Court on one count of second degree (intentional) murder and one count of second degree criminal possession of a weapon. This matter has been referred to the undersigned for the issuance of a Report and Recommendation on the disposition of Mitchell's petition. For the reasons set forth below, the Court recommends that petition be dismissed.

## II.     Factual Background and Procedural History

On the night of May 11, 1995, Darice Leonard ("Leonard"), was found shot in the head on DuPont Avenue in the City of Buffalo. Leonard subsequently died in the hospital from the gunshot wound. Arthur Mitchell ("Arthur")[1] was walking with Leonard at the time she was shot and identified petitioner as the shooter when shown a photographic array on May 17, 1995. Clarence Barker ("Barker"), a friend of Mitchell's who was with him at the time of the shooting,

_____

[1]      Arthur is no relation to petitioner.

also identified Mitchell as the perpetrator. According to Barker, the shooting was in retaliation

for Darice's alleged involvement in the abduction of Mitchell a couple of days before the

shooting; Mitchell claimed that he had been kidnaped and robbed of his drugs by two men named

"Jamie" and "Garth," along with a woman not known to him at the time. Barker told the police

that when Mitchell saw Darice on the night of the shooting, he informed Barker that she had been

the woman involved in the abduction. Petitioner told his friend Nathan Roland ("Roland") of his

culpability while the two of them were watching a news broadcast about the shooting. Roland

subsequently identified petitioner as the shooter. Both Barker and Roland agreed to testify for the

prosecution in exchange for plea deals on unrelated pending charges.

Petitioner was arrested and an Erie County Grand Jury returned Indictment No. 95-1531-

001 charging him with one count of second degree (intentional) murder (N.Y. Penal Law §

125.25(1)) and one count of second degree criminal possession of a weapon (N.Y. Penal Law §

265.03)). The identifications made by Arthur Mitchell, Barker, and Roland were held to be

admissible following a hearing pursuant to Wade. Petitioner's trial commenced on January 14,

1997, in Erie County Court (Drury, J.).

At trial, Arthur Mitchell that he was living in Buffalo in May of 1995, at which time he

was acquainted with Darice, the victim. T.37-36.[2] On the night of May 11, 1995, at about 10

p.m., he was walking with Darice to the Big Apple convenience store on Woodlawn and

Jefferson Avenues in the City of Buffalo. T.39. When they turned the corner onto Dupont

Avenue, "five guys," including Mitchell, came across over there . . . to talk to Darice." T.40.

---

[2]      Citations to "T.__" refer to the trial transcript.

Arthur testified that Mitchell asked Darice several times whether "she used to be with Jamie?"[3] T.41-42. After Mitchell asked her for the third time whether she "used to be with Jamie," Darice said, "you must mean my sister, my twin sister." T.83. At that point, Arthur related, Mitchell "pulled – went into his pants, pulled out a gun a shot her." T.42, 72, 83. Arthur testified that Mitchell was standing "[a]bout two feet" away from Leonard and he gave "[n]o warning" before he fired the gun. *Id.*

Immediately after he fired the shot, Petitioner fled. *Id.* Arthur Mitchell then walked towards the store and went back to his mother's house, where he "sat in the dark, because [he] was nervous and scared, and then a little while later the FBI knocked on [his] door." T.45-46. When the investigators asked, "Did you get a real good look at the shooter," he answered, "I got a real good look at his face." T.91. Arthur recalled that he was standing "pretty close" to Mitchell (about six feet away) under a streetlight on Dupont Avenue during this time and could see him clearly. T.54. Mitchell had the hood of his jacket up, but it was not tight around his face, and Arthur was able to see petitioner's features. T.70. Arthur testified that the conversation between Leonard and Mitchell took about twenty seconds, during which time Arthur observed petitioner under the streetlight. T.55.

When Arthur was first shown pictures of suspects, Mitchell was not in any of the arrays. On May 17, 1995, Detective Mark Stambach ("Det. Stambach") showed him a photo array with Mitchell's picture in slot five, and Arthur identified him as the shooter. Det. Stambach  T.211. At that point, Det. Stambach had not yet interviewed Barker or Roland. According to Det.

---

[3]       "Jamie" was one of the individuals who allegedly had kidnaped Mitchell. Arthur testified that he knew Jamie and that Jamie was a friend who used to hang around with Leonard, somebody named "Garth Clark," and "a lot of people." *Id.*

Stambach, Arthur's first response upon seeing the array was that "number five looked like the man that shot Leonard. And then after looking at it for several seconds he changed it to that was the man that shot [her]." T.212.

Nathaniel Roland ("Roland") testified for the prosecution that he had known Mitchell since the seventh grade. T.96. In May 1995, he used to hang out with Mitchell and a person named Timothy Manuel near the park on DuPont Avenue. At one point, Roland testified, they noticed that Mitchell had not been around for a couple days, so they went looking for him at his grandmother's house. Mitchell informed Roland that he had been kidnaped by two individuals named Jamie and Garth but he did not say why. T.98-99. At that time, Mitchell did not mention a woman being involved but he later told Roland that a woman was with the abductors. T.99. Roland claimed that he never learned who she was. T.99.

Roland testified that [on ] Mitchell told him that Darice had been involved in the kidnaping and that "he was going to get her." T.99-101. Roland also testified that he watched the newscast regarding homicide with Mitchell at Mitchell's house at 216 Johnson Street right after the murder. During the broadcast, Mitchell "said that it was his work." T.101-02. However, Mitchell did not tell Roland what he did that night. T.102.

When questioned at trial as to whether he recalled testifying before the grand jury regarding Darice's murder, Roland stated that he did not recall and that he "never" came to the grand jury to give testimony. T.104-05; 106. The trial court sustained defense counsel's objection on this question. The prosecutor then attempted to refresh Roland's recollection with the transcript of his grand jury testimony. T.106. Roland testified that, after reading the excerpt detailing his conversation with Mitchell about approaching Darice, T.107, his recollection was

-4-

not refreshed "because they got that paperwork wrong." T.108. Roland continued to deny that he

did give testimony in the grand jury but then he said, "I gave them the testimony, they just got the

paperwork wrong. They got stuff down there that they said I said that I didn't [say]." T.109.

Roland then testified that Petitioner told him that "Clarence [Barker] " was with him on the night

that he encountered Darice. T.109.According to Roland, Petitioner "just said he got her, just like

that, and that Clarence was with him." T.110. The prosecutor's final question elicited an

admission from Roland that just prior to his testimony, he had a conversation in the hallway with

a person named Alfred Taylor, who happened to be the cousin of the petitioner. T.110.

On cross-examination, defense counsel brought out that Roland had made a plea deal to

probation with regard to an unrelated robbery of a pizza deliveryman during the summer of 1995

following Darice's murder. T.111-12. Roland testified that Barker and Manuel also were charged

in that matter. T.112. According to Roland, Mitchell told the police that Roland, Manuel and

Barker had robbed the pizza deliveryman at gunpoint. T.115. Roland admitted that it was "a

terrible thing for [Mitchell] to snitch on [him]" but claimed that he was "not getting even" by

testifying at Mitchell's trial. T.113, 116. Roland stated that his testimony against Mitchell was

"part of [the] deal" the prosecutor made with regard to the robbery case. T.111.

Roland denied that he was at the scene of the murder. During cross-examination, when

shown his grand jury testimony, Roland admitted testifying, "Yeah, we all hang down there at the

corner in front of the store and a guy named Jamie Swanson had kidnaped Emmanuel Mitchell"

although he did not mean that he actually saw the kidnaping. T.118.

Roland admitted that he also pled guilty another case in which the police found nineteen

bags of crack cocaine on the ground in front of him and stated that it was his. T.126. Roland

stated that he lied about his ownership of the bags of crack because his lawyer told him to take a plea deal to both cases. T.127.

Defense counsel asked Roland if he told "any lies" during his testimony and Roland answered, "No. But I would like to say that I just found out what a Grand Jury is." T.134. The prosecutor then conducted a re-direct examination of Roland in which Roland stated that he now remembered testifying before the grand jury. T.134, 140. Defense counsel registered an objection on the basis that "[d]uring the recess, he obviously had a chat with [the prosecutor], and now he's changing his testimony." T.141. The trial court stated, "Overrule the objection if you don't state a grounds." *Id.*

On re-direct, Roland, having been refreshed with his grand jury statement, recalled that he testified at the grand jury as follows: when he and Mitchell were watching the news broadcast about the shooting, Mitchell "said it was his work, and he said that he shot her point blank range . . . [o]n her head." T.142. Roland testified that he initially disclaimed his grand jury testimony because he "didn't know what a Grand Jury was." T.152.

On re-cross-examination, Roland testified that the prosecutor did not talk to him first but rather Roland asked him a question about what a grand jury was. Roland denied that the prosecutor had "explained to [him] that [he] had been in the Grand Jury." T.143 There was no further examination of Roland by defense counsel or the prosecutor.

Clarence Barker ("Barker") testified next for the prosecution. He admitted that he had been involved in the robbery of the pizza deliveryman in May 1995, and that he agreed to testify against Mitchell as a result of being charged in that incident. Barker testified that he had known Mitchell for the three years prior to the shooting. T.146-47. According to Barker, he knew

Mitchell by the street-name of "E-Tech." T.147.

Barker related that on the night of May 11, 1995, Barker was with Mitchell on Winslow Avenue near DuPont Avenue; there were several other people around whose names Barker said he did not "really remember." T.149. Barker testified that he saw "a lady and an old – and a man" who was in his "[t]hirties, forties." T.150. Mitchell said, "[T]hat's the girl that was, you know, down, were robbing me[.]" Barker clarified that statement as meaning that "[s]he was the girl that had robbed him." *Id.* Barker had heard about the night that Mitchell had been robbed by "Jamie" and "some other kid with dreds [sic] or something" and "the girl." T.151. Petitioner then walked down the street to Dupont and Woodlawn were the girl and man were standing. T.152.

Barker related that Mitchell went over and was "talking [Darice] for a second" and then pulled a handgun out of his jacket, shot the woman in the head, and then walked away. T.153-54. Barker testified that he and Mitchell left together but he did not know where Mitchell went afterwards. *Id.*

A few days later, Barker testified, Detective Mark Stambach ("Det. Stambach") of the Buffalo Police Department came to his house. After talking to Barker's mother, Det. Stambach and took him downtown for questioning.[4] T.155, 169. Barker testified that he was "[w]orried about . . . being a victim [sic] – saying that I shot her" and that was why he wanted to talk to the prosecutor before giving a statement. T.155-56. Barker testified that the prosecutor told him, "If

---

[4]        Det. Stambach testified that when he was interviewing Barker, he "didn't firmly believe [Barker] was a suspect" but that "[Barker] might have been a witness" because Barker seemed "scared" and seemed to be "holding something back" during the interview." T.220.  Barker asked Det. Stambach "to consult with the man in charge [*i.e.*, the assistant district attorney]," and the prosecutor came to the interview room and talked to Barker privately. T.220-21. After that conversation, Barker indicated that he was changing his story and gave a statement that "Tech [*i.e.*, Mitchell] shot her." T.222. Barker also selected Petitioner's picture from a photographic array. T.223.  Det. Stambach testified Barker did not ask to see another lawyer. T.220.

you didn't do it, you don't have nothing [sic] to worry about, just don't lie." T.156. After that,

Barker gave a statement implicating Mitchell in the shooting. *Id.*

On cross-examination, Barker was an easily led witness. He admitted that he initially

denied that he was at the crime scene but that he later changed his story because the police were

"pressuring" him by threatening to charge him with the murder. T.170-71. In response to

counsel's statement, "[T]hat's when you dreamt up this story about telling them that [Mitchell]

shot her[,]" Barker answered, "Yes." T.171. Barker agreed with defense counsel that at the time,

he wanted the police to get him a lawyer. T.177. He agreed with defense counsel that he was not

informed of his rights and that when they put him on the phone with the district attorney, he did

not know that he was talking to the prosecutor. T.177-79.

Barker then testified that the prosecutor asked him, during the phone conversation, if he

shot the girl, and Barker said no. T.179. The prosecutor then said, "if you didn't shoot her, you

don't have nothing [sic] to worry about . . . just don't lie." *Id.* That was the extent of their

conversation. *Id.* Barker testified that he got a "good deal" on the prosecution for his involvement

in the robbery of the pizza deliveryman; he was sentenced to probation. T.181.

On redirect examination, Barker admitted that it was fair to say that if he had his way, he

never would have been a witness in the case against Mitchell. T.195. However, he stated that his

statement to the police and his testimony at the grand jury and at trial were truthful. T.196-97. He

maintained that he had witnessed the murder and that Mitchell was the shooter, but he did not

want to tell anybody about it. T.197. He agreed that "[c]ircumstances"–namely, his involvement

in the robbery of the pizza deliveryman and the fact that the police told him that they knew he

had been at the murder scene–"made [him] tell." T.197.

The prosecution presented testimony by the medical examiner that the victim's cause of death was a gunshot wound to the head. T.247. The victim sustained an entrance wound on the right-side of the forehead near the hairline with evidence of gunpowder stippling. T.245. The stippling indicated that it was "close range firing" meaning that the distance from muzzle of the gun to the shooter's target was about ten to eighteen inches. T.245-46.

The prosecution rested at this point, and the defense did not call any witnesses. The jury returned a verdict convicting Mitchell as charged in the indictment of second degree (intentional) murder (N.Y. Penal Law § 125.25(1)) and second degree criminal possession of a weapon (N.Y. Penal Law § 265.03). He was sentenced to an indeterminate term of imprisonment of 25 years to life on the murder count and a concurrent indeterminate term of 5 to 15 years on the weapon possession count.

Represented by different counsel on his direct appeal, Petitioner argued that the trial court deprived him of due process and his Sixth Amendment rights to compulsory process and confrontation by not allowing him to call the identifying witnesses at the pre-trial suppression hearing; that the trial court improperly allowed admission of evidence regarding Petitioner's prior drug dealings; that the prosecutor committed misconduct during his summation; and that Petitioner's sentence was harsh and excessive. Petitioner also filed a *pro se* supplemental appellate brief asserting that the evidence against him was legally insufficient; the trial failed to properly instruct the jury on the burden of proof regarding identification; trial counsel was ineffective in failing to request a jury instruction on the principle of "*falsus in uno, falsus in*

*omnibus*"[5] and in failing to challenge a partial juror; the prosecutor committed misconduct; and

that the cumulative effect of these errors deprived him of a fair trial. The Appellate Division,

Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on

March 29, 2000, but held that his sentence for the weapons possession conviction was illegal and

remitted the matter to Erie County Court for re-sentencing on that count only. *People v. Mitchell*,

270 A.D.2d 859 (App. Div. 4th Dept. 2000). Leave to appeal to the New York Court of Appeals

summarily was denied on June 27, 2000. *People v. Mitchell*, 95 N.Y.2d 837 (N.Y. 2000).

Mitchell then filed a *pro se* motion to vacate the judgment pursuant to New York

Criminal Procedure Law ("C.P.L.") § 440.10, arguing that the trial court should have recused

itself due to its involvement in criminal proceedings involving prosecution witnesses Roland and

Barker. Mitchell also claimed to have evidence exonerating him in the form of an affidavit from

Roland stating that Roland had "no personal knowledge" of the homicide and gave "false

information" to the district attorney because his defense counsel advised him that he would

receive a "long prison term" if he did not cooperate. Roland also stated in his recantation that he

had informed the trial judge that he had no knowledge of the homicide. The trial court (Drury, J.)

denied the motion to vacate, holding that Mitchell had not made the showing required under

C.P.L. § 440.10(1)(c) that the prosecutor knew of any perjury by Roland, and furthermore, that

the affidavit did not constitute "new evidence" creating a probability that Mitchell would have

received a more favorable verdict. *See* C.P.L. § 440.10 Order dated February 23, 2000, at p. 3

---

[5]        "The *falsus in uno* charge states, in pertinent part:  Should you, in the course of your deliberations, conclude that any witness has intentionally testified falsely to a material fact during the trial, you are at liberty to disregard all of his testimony on the principle that one who testifies falsely as to one material fact may also testify falsely to other facts[.]" *People v. Santiago*, 13 A.D.3d 81, 82 (App. Div. 1st Dept. 2004) (quotations and quotation marks omitted).

(citing, *inter alia* N.Y. Crim. Proc. Law § 440.10(1)(c)). Leave to appeal the denial of the C.P.L. § 440.10 motion to the Appellate Division was denied on April 25, 2000.

Mitchell filed this federal habeas petition asserting that the trial court denied him his Sixth Amendment right to compulsory process by denying his request to call the identifying witnesses at the pre-trial suppression hearing; the trial court's jury instruction on identification was erroneous; prosecutorial misconduct deprived him of his due process right to a fair trial; and trial counsel was ineffective in failing to challenge for cause a purportedly biased juror. For the reasons that follow, the Court recommends that Mitchell's request for a writ of habeas corpus denied and that the petition be dismissed.

## III.   Discussion

### A.   Standard of Review

Mitchell's petition is governed by 28 U.S.C. § 2254, as amended by the Anti-terrorism and Effective Death Penalty Act ("AEDPA") in 1996. To obtain habeas relief under AEDPA, where the state court has adjudicated a petitioner's federal constitutional claim on the merits, a petitioner must demonstrate that the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76  (2000).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quotation omitted). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a

conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

court decides a case differently than this Court has on a set of materially indistinguishable facts."

*Williams v. Taylor*, 529 U.S. at 412-13 (O'Connor, J., concurring and writing for the majority).

The "unreasonable application" clause is applicable when "the state court identifies the correct

governing legal principle from this Court" decisions but unreasonably applies that principle to

the facts of the prisoner's case." *Id.* at 413. Under AEDPA, "a federal habeas court may not issue

the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly. Rather,

that application must also be unreasonable." *Id.* at 411.  In order to grant the writ there must be

"some increment of incorrectness beyond error," although "the increment need not be great;

otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest

judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal

quotation marks omitted).

**B.      Merits of the Petition**

**Ground One:            A Writ of Habeas Corpus Under 28 U.S.C. § 2254 is the Proper
                         Remedy for Setting Aside Petitioner's Finding of Guilt**

In support of Ground One, Mitchell alleges that he is being held in custody in violation of

the Constitution of the United States by the New York State Department of Corrections; that he

has fully exhausted his state court remedies pursuant to 28 U.S.C § 2254(b)(1)(A) as amended by

AEDPA; and that his petition is timely under 28 U.S.C. § 2244(b)(1)(A), as amended by

AEDPA. Respondent does not contest the contentions set forth in Ground One. The Court agrees

with Mitchell that he has fulfilled the jurisdictional requirements for filing a petition pursuant to

28 U.S.C. § 2254; that his claims are fully exhausted; and that his petition is timely. Whether he

has made an adequate showing that he is being held in violation of his federal Constitutional

rights will be discussed below in this Report and Recommendation.

**Ground Two:**        **The Trial Court's Denial of Permission to Call the Identifying Witnesses at the _Wade_[6] Hearing Violated Petitioner's Due Process and Sixth Amendment Rights.**

Mitchell contends that there was "an issue as to the suggestiveness of the identification

process" which was "not the result of the police but instead the result of the prosecution."

Petitioner's Memorandum of Law ("Pet'r Mem.") at 10 (Docket No.10). Mitchell argues that

trial counsel discovered that at least two witnesses had been "coerced and or having [sic] undue

pressure applied to them before choosing a photograph of Mr. Mitchell" and was wrongfully

precluded from calling identifying witnesses to testify at the _Wade_ hearing.

When this claim was raised on the direct appeal, the Appellate Division rejected it as

follows:

> Defendant contends that County Court improperly denied his request to call
> identifying witnesses at the _Wade_ hearing. It is well settled that a defendant does
> not have an absolute, unqualified right to examine the complaining or identifying
> witnesses at a _Wade_ hearing[.] The right is generally triggered only when the
> hearing record raises substantial issues as to the constitutionality of the
> identification procedure, where the People's evidence is notably incomplete, or
> where the defendant otherwise establishes a need for the witness's testimony[.]
> The People met their initial burden of establishing the reasonableness of the police
> conduct and the lack of any undue suggestiveness in the pretrial identification
> procedure, and defendant failed to meet his burden of proving that the procedure
> was unduly suggestive.

_People v. Mitchell_, 270 A.D.2d at 859 (internal citations and quotation marks omitted; alterations

added). This holding was neither contrary to, nor an unreasonable application of, clearly

---

[6]        _United States v. Wade_, 388 U.S. 218 (1967).

established Supreme Court precedent.

"'The purpose of a *Wade* hearing is to determine [before] the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification.'" *Lynn v. Bliden*, 443 F.3d 238, 248 (2d Cir. 2006) (quoting *Twitty v. Smith*, 614 F.2d 325, 333 (2d Cir.1979) (citing *Wade*, 388 U.S. at 242)). In general, a request for a *Wade* hearing is granted where any question is raised concerning the suggestibility of the identification procedure. The federal constitution, however, establishes no *per se* rule mandating that such a hearing be held prior to trial, as a matter of federal constitutional law. *Watkins v. Sowders*, 449 U.S. 341, 346-47 (1981); *accord United States v. Archibald*, 734 F.2d 938, 940-41 (2d Cir.), *modified on other grounds*, 756 F.2d 223 (2d Cir. 1984).[7]

Here, Mitchell was granted a *Wade* hearing, but he claims that the hearing court violated his Sixth Amendment "right to offer the testimony of witnesses, and to compel their attendance, if necessary, [which] is in plain terms the right to present a defense." *Taylor v. Illinois*, 484 U.S. 400, 409, *reh'g denied*, 485 U.S. 983 (1988) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)). While this right is "a fundamental element of due process law," it is essentially a trial right of the defendant to present his or her "version of the facts . . . to the jury so it may decide where the truth lies." *Id.* Although the right of compulsory process has been characterized as "fundamental, " *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), it is not absolute, even at trial, and may yield to policy considerations such as the State's interest in the orderly conduct of

---

[7]     Under New York state law, a defendant challenging the admissibility of a witness' identification is presumptively entitled to a *Wade* hearing even if, on a motion to suppress the allegedly impermissibly suggestive procedures, the defendant fails to assert specific facts establishing the deficiency. *See People v. Rodriguez*, 79 N.Y.2d 445, 453 (N.Y. 1992); *accord Alvarez v. Fischer*, 170 F. Supp.2d 379 (S.D.N.Y. 2001).

trials, *Taylor v. Illinois*, 484 U.S. at 414-16.

In *People v. Chipp,* 75 N.Y.2d 327 (N.Y. 1990), New York Court of Appeals placed limitations on a defendant's Sixth Amendment right to compulsory process at his *Wade* hearing–in particular, the right to call the complaining witness. Although a *Wade* hearing is "properly characterized as a criminal proceeding," it nevertheless does not involve a determination of a defendant's guilt or innocence but rather functions to determine whether a police-arranged pretrial identification procedure was unduly suggestive. *Id.* at 337 (citing *Stovall v. Denno*, 388 U.S. 293 (1967)).  Finding that defendant had offered no persuasive authority for the proposition that an absolute right to compulsory process attaches to a *Wade* hearing, the *Chipp* court reiterated that "any right of compulsory process at a *Wade* hearing may be outweighed by countervailing policy concerns, properly within the discretion and control of the hearing Judge." *Id.*  Accordingly, the New York Court of Appeals in *Chipp* rejected defendant's claim that he had an absolute right to call the complainant to testify at the *Wade* hearing and held that since there was no indicia of suggestiveness in the identification procedure, the trial court did not abuse its discretion in declining to permit the defendant to call the complaining witness at the *Wade* hearing. *Id.* at 339.

Given *People v. Chipp*'s holding, federal habeas courts in this Circuit have held that a state court's denial of a petitioner's request to call witnesses at a *Wade* hearing does not deprive a petitioner of a federal constitutional right or address a matter of clearly established federal law as required for habeas review. *See Duran v. Miller*, 322 F. Supp.2d 251, 257 (E.D.N.Y. 2004) (noting that petitioner did not have absolute right, under New York or federal law, to compulsory process at pretrial suppression hearing; holding that state trial court's discretionary exclusion of

identifying witness at pre-trial hearing, under New York law, did not rise to level of

constitutional error cognizable on petition for federal habeas relief) (citing *Mitchell v. Fischer*,

No. 02-CV-6336 (JBW), 2003 WL 22952851, at *6 (E.D.N.Y. Oct. 20, 2003) (holding that a

defendant does not have an absolute right to have a complainant produced at a *Wade* hearing );

*Heron v. People of the State of New York*, No. 98 Civ. 7941(SAS), 1999 WL 1125059, at *10

(S.D.N.Y. Dec. 8, 1999) (rejecting habeas claim that petitioner was denied right to call witness at

*Wade* hearing; under New York law, there exists no absolute rule requiring the identifying

witness to appear at a *Wade* hearing when the suggestiveness of the identification procedure is

called into question)); *Rivalta v. Artuz*, No. 96 CIV. 8043(SAS), 1997 WL 401819, at *3

(S.D.N.Y. July 16, 1997) (rejecting claim of habeas petitioner contends that because the trial

judge prevented him from calling the complainants at the *Wade* hearing, he was denied his

constitutional right to a fair trial where petitioner's objection was "predicated on the purely

speculative assertion that the complainants' testimony at the *Wade* hearing might have revealed

that something improper was said to them at the pretrial identification procedure"). Whether or

not to exclude an identifying witness is generally a discretionary matter for the judge at a pre-trial

hearing and therefore does not rise to the level of constitutional error. *Duran v. Miller*, 322 F.

Supp.2d 251, 257 (E.D.N.Y. 2004) (citing *Sorenson v. Superintendent*, No. 97 Civ. 3498(NG),

1998 WL 474149, at *4 (E.D.N.Y. Aug. 7, 1998) ("Generally, the discretionary exclusion of an

identifying witness by a trial judge at a pre-trial hearing does not rise to the level of constitutional

error.")).

     At most, then, Mitchell is asserting that the trial court abused its discretion and

committed a violation under *People v. Chipp*. This is merely an alleged violation of State law, for

which federal habeas review is unavailable. See *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).  Notably, Mitchell concedes that any "suggestiveness was not result of the police[,]" arguing that it resulted instead from the prosecutor allegedly applying undue pressure on "at least two of the identifying witnesses . . . before choosing a photograph of Mr. Mitchell."  Pet'r Mem. at 10 (Docket No. 10). The *Wade* hearing court heard testimony and made extensive, detailed findings of fact regarding the photographic identifications by Arthur, Roland, and Barker and concluded that there was no suggestiveness during any phase of the identification procedure. In order to rebut the state court's factual findings on the issue of suggestiveness, which must be presumed correct in this habeas proceeding pursuant to 28 U.S.C. § 2254(e)(1), Mitchell must offer "clear and convincing" evidence of incorrectness. This he has failed to do. Thus, Mitchell has failed to demonstrate that there was an error of state law with regard to the suppression court's refusal to allow him to call the identifying witnesses at the *Wade* hearing, let alone an error of federal constitutional magnitude. Accordingly, the Court recommends that this claim be dismissed.

**Ground Three:**     **The Trial Court's Jury Instruction on Identification was Erroneous.**

Mitchell alleges that the trial court failed to properly instruct the jury on the prosecution's burden of proof regarding petitioner's identification as the shooter. At the charge conference, the trial court denied defense counsel's request to issue a so-called "expanded" identification charge. T.265. On direct appeal, the Appellate Division summarily dismissed this claim, raised by Mitchell in a *pro se* supplemental brief, as without merit. This holding was neither contrary to,

-17-

nor an unreasonable application of, clearly established Supreme Court precedent.

It is well-established that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. at 67-68. The Supreme Court has held that "[b]efore a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v Naughten*, 414 U.S. 141, 146 (1975); *accord*, *e.g.*, *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001). A trial court's failure to issue a properly requested jury charge does not, standing alone, violate a habeas petitioner's right to due process. *E.g.*, *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990).

With regard to the propriety, as a matter of state law, of Mitchell's request for an expanded identification charge, the New York Court of Appeals has held that "although expanded identification instructions are preferable, especially when there is a close question of identity, the failure to give such an instruction does not constitute reversible error." *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (citing *People v. Whalen*, 59 N.Y.2d 273, 278-279 (N.Y. 1983); *People v. Love*, 244 A.D.2d 431, 664 N.Y.S.2d 91, 92 (App. Div. 2d Dept. 1997)). However, as long as the trial court issues "'a general instruction on weighing witnesses' credibility and . . . states that identification  must be proven beyond a reasonable doubt,'" a jury charge on identification is an "'accurate statement of the law.'" *Aparicio*, 269 F.3d at 99 (quoting *People v. Whalen*, 59 N.Y.2d 273, 279 (N.Y. 1983)). Notably, the decision as to whether or not to give an expanded instruction on the issue of identification resides within "the sound discretion

of the trial judge." *Id.*

Mitchell was not entitled to an "expanded" instruction on identification as a matter of federal constitutional law. Furthermore, it was not reversible error, even as a matter of state law, for the trial court to decline to give the "expanded" version at this trial. Most important, Mitchell can point to no specific errors in the actual charge given on identification but rather only asserts that "[t]he lower Court's instruction on identification did not convey, with sufficient clarity, the requirement that the prosecution *must* prove identification beyond a reasonable doubt." Petitioner's *Pro Se* Appellate Brief ("Pet'r App. Br.") at 7, Respondent's Exhibit ("Resp't Ex.") B (emphasis in original). This claim is belied by the trial judge's thoroughly correct and detailed instruction to the jury on identification, given after his general charge on the law in which he repeatedly emphasized the prosecution's burden of proving each element beyond a reasonable doubt. *See* T.356-61.

Indeed, the trial court went well beyond the minimum requirements of New York state law, which simply are that the jury must be instructed that they may only convict if, after assessing the credibility of the identifying witnesses, they are convinced beyond a reasonable doubt that Mitchell was the individual who perpetrated the offense. Thus, the trial court's charge "more than sufficed as an accurate statement of the law." *People v. Whalen*, 59 N.Y.2d at 279; *accord Aparicio v. Artuz*, 269 F.3d at 99. As long as the charge actually given was not erroneous–as it was not here–there is no basis for finding that Mitchell's trial was marred by an error of state law, let alone a federal constitutional violation. Habeas relief therefore should not issue on this claim.

**Ground Four:          Prosecutorial misconduct deprived petitioner of his due**

**process right to a fair trial.**

Mitchell alleges that several remarks by the prosecutor during his summation amounted

to misconduct sufficient to prejudice his due process right to a fair trial. On direct appeal, the

Appellate Division held as follows:

> Only one of th[e] instances of alleged misconduct is preserved for our review, and
> we decline to exercise our power to review the remaining instances as a matter of
> discretion in the interest of justice. The one preserved instance occurred during the
> prosecutor's summation, and the court advised the jury to disregard the
> prosecutor's statement. In any event, that statement, viewed in the context of the
> entire summation, is not so inflammatory or egregious as to amount to a denial of
> due process.

*People v. Mitchell*, 270 A.D.2d at 859.[8]

For habeas relief to be granted based on a claim of prosecutorial misconduct, the alleged

errors must have "'so infected the trial with unfairness as to make the resulting conviction a

---

[8]        Here, the Appellate Division issued two holdings with regard to Mitchell's claims of prosecutorial
misconduct; one was a ruling on the merits as to the one preserved claim, and the other holding rested entirely on the
state procedural rule requiring a contemporaneous objection to preserve claims of prosecutorial misconduct for
appellate review. The ruling as to the preserved claim is an "adjudication" on the merits to which AEDPA's
deferential standard of review applies. The other ruling that the remaining claims were unpreserved rest on an
independent state procedural bar "contain[s] a clear statement of reliance on a state procedural bar" and "[n]o
AEDPA deference is due to th[at] decision[ ], but the state may successfully assert that habeas relief is foreclosed
provided that the independent state procedural bar is adequate to support the judgment and that neither cause and
prejudice nor a fundamental miscarriage of justice is shown." *Jimenez v. Walker*, 458 F.3d 130, 145-46 (2d Cir.
2006). It is important to note that "[b]ecause the existence of an adequate and independent procedural bar is not
jurisdictional in the habeas context, a federal court is not required to raise it *sua sponte*[.]" To the contrary, it is "'a
defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter.'"
*Id.* (quoting *Trest*, 522 U.S. at 89) (alteration and quotation marks omitted in original). Thus, if the state waives the
right to make this argument, *id.* (citing *Trest*, 522 U.S. at 89), and AEDPA deference is not due, *id.*, then the Second
Circuit directs that habeas courts "apply pre-AEDPA standards[,] *id.* (citing *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d
Cir. 2001)); *accord Murray v. Greene*, No. 06 Civ. 3677(AJP),2006 WL 3751294, at *10 (S.D.N.Y.  Dec. 21, 2006)
("Of course, '[i]f there is no [state court] adjudication on the merits [and no procedural bar], then the pre-AEDPA,
de novo standard of review applies.'") (quoting *Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) and citing
*Jimenez v. Walker*, 458 F.3d at 145 n. 17)). Here, respondent has not raised the affirmative defense that several of
Mitchell's claims are arguably procedurally barred by reliance on an adequate and independent state ground, and
therefore has waived the defense. Regardless of whether Mitchell's claims of prosecutorial misconduct are evaluated
under AEDPA's deferential standard or a *de novo*, pre-AEDPA standard, the Court believes that the outcome is the
same–they do not provide a basis for granting habeas relief.. Therefore, parsing out the different instances of alleged
misconduct based on whether they were or were not "adjudicated on the merits" is unnecessary here.

denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). For a writ of habeas to be warranted, a petitioner must show "'that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir.1998) (quoting *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994)). Criminal convictions are not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone in an otherwise fair proceeding. *United States v. Young*, 470 U.S. 1, 10 (1985) (stating that the context in which remarks were made must be examined to determine their probable effect on the jury's ability to judge the evidence fairly); *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.) ("The test is whether the statements, viewed against 'the entire argument before the jury,' *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 242 (1940), deprived the defendant of a fair trial. *United States v. Praetorius*, 622 F.2d 1054, 1060 (2d Cir.1979), *cert. denied*, 449 U.S. 860 (1980)."), *cert. denied*, 472 U.S. 1019 (1985). Thus, the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Accordingly, the Second Circuit has "adopted a contextual approach that considers the following factors: 'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir. 1986) (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981), *cert. denied*, 456 U.S. 989 (1982)). The Court will review the propriety of the alleged instances of misconduct and then evaluate their effect on the fairness of Mitchell's trial in light of the Second Circuit's *Modica* factors.

The Court turns first to the one comment which was preserved by defense counsel's objection and held on appeal not to constitute a denial of petitioner's due process rights. The remark occurred during summation when the prosecutor referred to a question posed earlier by defense counsel in his summation [9]:

| | |
|---|---|
| The Prosecutor: | Now, Nathaniel Roland is the consummate demonstration of the question asked by defense counsel, what kind of world do we live in, or what kind of society do we live in. Well, we live in a society where – and this is terrible, but we live in a society where fear can come from the streets through that courtroom door and be in here. You see anybody can come to court. Anybody can come to court. As a matter of fact, anybody can say anything during a proceeding. Lawyers can stand up and lie when they sum up to juries and they're -- |
| Defense Counsel: | I'll object, your Honor. |
| The Prosecutor: | – and they're immune from a civil suit. |
| The Court: | I'm sure that wasn't referring to [defense counsel]. |
| Defense Counsel: | He pointed right at me, your Honor. |
| The Court: | I don't think he pointed at you. So jury disregard that. |

T.321-22.

To a certain extent, the prosecutor's statement that anyone can come into court and lie was in response to defense counsel's attack on the credibility of the prosecution witnesses–in particular, his assertion during his summation that he believed the prosecution's witnesses were

---

[9] During his summation, defense counsel said, "Well, in my closing I told you that you were about to enter a different world, and you did, and I could tell by your reactions during the trial that you were well aware of the fact that you were in a different world. . . . So this world that we're still kind of in, it's a world full of drug dealers, thieves, snitches, liars. I think you'll agree with me that there were a lot of lies told in this courtroom during this trial. There are also – there are also mistakes. Mr. Mitchell, Arthur Mitchell, who took the stand, who was in the company of Darice that night, I think he told a few lies." T.279. At that point, the prosecutor objected but was overruled to the extent that the trial judge stated that he would "allow both counsel leeway in arguing from their view of what the facts show."*Id.*

"liars" and "snitches." However, this Court nonetheless believes that the prosecutor went out of bounds and that this remark was improper, not to mention highly irrelevant. However, the trial court impliedly sustained defense counsel's objection and instructed the jury to disregard the remark. The Court notes that defense counsel did not request, and the trial court did not issue, any further curative instructions at the time.

There also were three instances of instances of prosecutorial misconduct which the trial court raised, *sua sponte*, with counsel after summations were concluded. First, the trial court noted that the prosecutor was "talking about information that was developed at the hospital, and you were very specific about that, which allowed the police to . . . begin a process whereby they [sic] led to the defendant,[10] but the only thing that  – this is dealing with a motive, but the only testimony I ever wrote down and that Officer Stambach gave was just the motive, without the detail you give – you gave." T.326. The prosecutor responded, stating that he "remember[ed] Detective Stambach testifying that he talked to the victim's mother, and the victim's mother told him that the victim may have been involved in this kidnaping." T.326. As defense counsel stated, he had objected to this line of questioning by the prosecutor of the victim's mother, and the trial court had sustained the objection on hearsay grounds.[11] T.209-10. With defense counsel's assent,

_____

[10]          During his summation, the prosecutor made the following comment:

So, what do they [the police] find out at the hospital? *They find out at the hospital* that the word is Darice [the victim] was somehow involved with some guy named Garth, and some guy named Jamie, who supposedly took off somebody, the street vernacular took off, grabbed him, held him, robbed him whatever, and that this may be the reason.

T.312 (emphasis added).

[11]          This Court has reviewed the trial transcript and defense counsel did object to the prosecutor's line of questioning on hearsay grounds; the trial court sustained the objection:
          Q:      Did you have occasion to talk to any of her [the victim's] family members at the hospital?
          A:      Yes, I did.

the trial court gave the following appropriate instruction to the jury:

> I notice in the last summation that there was reference to some specific motive
> that – that the victim's mother had given Officer Stambach at the hospital, uh, I
> don't know whether that was testimony. I know there was motive – testimony
> about motive, but I don't know if the detail was actually set forth through Officer
> Stambach; and, if it isn't, then disregard it.
> T.330.

Second, the trial court *sua sponte* raised the issue of "some argument [the prosecutor]

made about Roland taking the plea, then giving the statement." T.327. The trial judge stated, "I

don't think that there was ever that sort of precision, precise information was ever set forth in the

record." *Id.* The prosecutor argued that the record contained information that the date of Roland's

plea and the date he gave his statement, with his attorney, to the police, were the same. *Id.* The

trial judge agreed that the dates may have been the same but stated he was "not sure" that such

was "a fair inference" based solely on the dates of the two events being the same. *Id.* The

allegedly objectionable comment was as follows:

> Now, the case is rolling, but there's some delays built in. Now, the delay is that
> Clarence Barker and Nathaniel Roland have court cases pending. They got the
> pizza man robbery. Now, let me digress a minute, ladies and gentlemen, about the
> pizza man robbery and the deal. Well, now, first of all, you know, because the
> only sworn testimony that you heard in this courtroom is that on the day Clarence
> Barker gave his statement there was no deal negotiated. You also know that
> Nathaniel Roland didn't give his statement 'til '96, when he was in court with his
> lawyer, pled guilty. *That was the date of his plea and then [he] went to homicide*
> *and gave a statement.* Ergo the delay. Can't move these things much more
> quickly. So you know that the delay was built in. And you know that it was built
> in because of "the deal".

---

> Q:      And did you, at that point in time, receive information about a possible motive in this
>         particular shooting:
> A:      Yes, I did.
> Q:      What was that information?
> A:      From the mother of the deceased . . . she informed me that –
>         Mr. Abbate:      Objection, Your Honor, hearsay.
>         The Court:       Sustained.

T.315 (emphasis added). Although defense counsel did not object to this comment, he stated that he desired a curative instruction as to it. I do not find this comment to be overly prejudicial to the defense; if anything, it is an admission by the prosecutor that one of his chief witnesses received a favorable plea bargain in exchange for his cooperation in the case against Mitchell. In any event, the trial court indicated that it was going to give a "general instruction" that the jury was not to consider facts that were not in evidence and issued the following instruction:

> [I]n the last summation then there was – there was mention that the – that Nathaniel Roland had taken a plea and then gone over to the Police Headquarters to – to give a statement. I don't know if that was testified to. Uh, my recollection is not, but it's your recollection which must govern.

T.330-31.

Although it is "clear that it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence," *United States v. Rosa*, 17 F.3d 1531, 1548-49 (2d Cir.1994); *accord Tankleff v. Senkowski*, 135 F.3d at 253, the Court does not find that the two instances of this prejudiced petitioner's right to a fair trial. In the first instance, the prosecutor indicated that he believed that the testimony was otherwise, which supports a finding that the comment was not made in bad faith. In the second, the prosecutor's was not faulted for misrepresenting the evidence–the dates of the plea and the statement by Roland were the same–but rather for the inference that he was arguing from it. *See Flores v. Keane*, 211 F. Supp.2d 426, 436 (S.D.N.Y. 2001) ("Because the prosecutor's comments involved at most "minor inaccuracies" in a "few" instances, the alleged misconduct was not "severe.") (quoting *Tankleff*, 135 F.3d at 253 (where prosecutor mischaracterized evidence on summation, "the severity . . . was mitigated by the brevity and fleeting nature of the improper comments") and

citing *Leslie v. Artuz*, 72 F. Supp.2d 267, 278 (S.D.N.Y. 1999), *aff'd*, 230 F.3d 25 (2d Cir. 2000) ("[the prosecutor's] remarks represented either fair comment on the evidence, acceptable summation rhetoric, or [at worst] a minor misstatement of testimony not reasonably likely to create undue prejudice")). The Second Circuit has stated that it "[g]enerally would not reverse a criminal conviction merely because a prosecutor made an unsupported statement in argument." *Biasucci*, 786 F.2d at 514 (although prosecutor's remarks were "improper and ha[d] no place in any court, they were inconsequential, isolated aberrations in a lengthy trial" and did "not appear to have been made in bad faith").

The third comment about which the trial judge *sua sponte* raised a concern was the prosecutor's statement that "every day persons end up either at the Homicide Bureau or department in the Buffalo Police Headquarters . . . asking for a deal . . . ," stating that he found the comment "excessive." T.331. Although defense counsel did not object to this statement during the prosecutor's summation, when the trial judge brought it up afterwards, counsel stated that he did wish a curative instruction as to it. The "unsworn witness" rule in the context of prosecutorial misconduct "generally stands for the proposition that the prosecutor may not inject his own credibility into the trial. . . . [T]he rule is founded upon the possible danger that the jury, impressed by the prestige of the office of the District Attorney, will accord great weight to the beliefs and opinions of the prosecutor." *People v. Paperno*, 54 N.Y.2d 294, 300-01 (N.Y. 1981) (cited in *Dickens v. Filion*, 02 Civ. 3450, 2002 WL 31477701, at *12 (S.D.N.Y. Nov. 6, 2002)); *see also United States v. Locascio*, 6 F.3d 924, 933 (2d Cir.1993), *cert. denied*, 511 U.S. 1070 (1994). Furthermore, the prosecutor should not make appeals to the biases, passions and prejudices of the jury during summations, *see, e.g., Greenway v. Buffalo Hilton Hotel*, 143 F.3d

47, 51 (2d Cir.1998), or "seek to lead the jury away from the issues by drawing irrelevant and

inflammatory conclusions which have a decided tendency to prejudice the jury against the

defendant," *People v. Ashwal*, 39 N.Y.2d 105, 110 (N.Y. 1976)). Although the remark was

improper, the trial court at Mitchell's trial thereafter appropriately instructed the jury that this

comment by the prosecutor

> was testimony from Mr. Belling and not testimony that you can consider. He's not
> a witness. Mr. Abbate isn't a witness. The witnesses are the people you see here,
> and that's the only testimony you can regard. So, with that I'd ask you if – again,
> your recollection governs, not mine, but you're only to rely on testimony and not –
> and not – and not argument by itself. If the argument makes sense based on the
> testimony and the law, you can, of course, do with it as you wish.

T.331.

Finally, the Court turns to the remaining instances of alleged misconduct which were

raised for the first time by Mitchell's appellate counsel in his brief on direct appeal. *See* Pet'r

App. Br. at 14, Resp't Ex. A.  Appellate counsel did not explain why these statements were so

offensive, merely describing them as "other acts of misconduct[.]" Pet'r App. Br. at 14, Resp't

Ex. B. Mitchell first claims that the prosecutor "disparaged the reasonable doubt standard," Pet'r

App. Br. at 14, Resp't Ex. B, by stating that the jury heard "the reasonable doubt cheer from

defense counsel at the end there[,]" T.303. This comment apparently referred to defense

counsel's closing remark, "Reasonable doubt, reasonable doubt, reasonable doubt. When you

look at all the facts, and all the testimony, I believe that you must bring back a verdict of not

guilty." T.296. Given the context, the Court does not find that this constituted a "disparagement"

of the defense or the reasonable doubt standard. *Cf. United States v. Biasucci*, 786 F.2d at 514 &

n.9 (the prosecutor addressed defense counsel at one point as "you sleaze," at another as "you

hypocritical son --," as being "so unlearned in the law," and on several occasions the prosecutor objected to questions by the defense as "nonsense"; the Second Circuit found that "although the prosecutors disparaging remarks about defense counsel certainly were improper and have no place in any court, they were inconsequential, isolated aberrations in a lengthy trial"; did "not appear to have been made in bad faith"; and "were instead imprudent and infrequent 'outbursts'" which did not cause the trial to "r[i]se to the level of a proceeding marked by passion and prejudice") (citing *Bagaric*, 706 F.2d at 58-59; *Modica*, 663 F.2d at 1181; citations to transcript omitted).

Mitchell contends that the prosecutor "went into a long disquisition on one Arthur [sic] Taylor[12] who was not a witness at trial about whom little or no evidence was adduced at trial." Pet'r App. Br. at 14; *see* T.312-13. The Court has reviewed the pages cited and cannot find any "long disquisition" about Taylor. Furthermore, Mitchell does not explain how this purportedly was prejudicial to him. Therefore, the Court cannot find that any misconduct occurred in this instance.

Mitchell also argues that when discussing how the jury should evaluate the identification testimony of eyewitness Arthur, the prosecutor said, "Don't spend any time worrying about how long it took him to observe this event." T.313. Mitchell also complains that the prosecutor later "invite[d] the jury to role play the incident out with a watch in the jury room to determine how long the incident took and suggest[ed] that was how the main witness [Arthur Mitchell] figured out the time, clearly a matter not in evidence." Pet'r App. Br. at 14 (citing T.318). Mitchell does

---

[12]       Petitioner apparently is referring to Alfred Taylor, a cousin of his who attended the court proceeding.

not explain why this was improper. Moreover, the comments appear to be a fair response to defense counsel's argument that Arthur Mitchell's uncertainty as to how long he saw the face of the person who shot the victim created "reasonable doubt right there." T.279. The Court does not see how these two comments–which incidentally appear to contradict each other–prejudiced the defense.

Finally, Mitchell contends that the prosecutor purportedly "equate[d] defendants with criminals" when the prosecutor asked rhetorically, "What kind of society do we live in? The kind of society where the defendants, where the criminals pick the witnesses. I don't pick the witnesses." T.316. This remark apparently referred to defense counsel's earlier comment in his summation that, as he had told the jurors in his opening statement, they "were about to enter a different world" during trial, one which is "full of drug dealers, thieves, snitches, liars." T.278. Defense counsel then commented, "I think you'll agree with me that there were a lot of lies told in this courtroom during this trial[,]" T.278, and stated, "I think he [eyewitness Arthur Mitchell] told a few lies[,]" T.279. Viewed in context, the prosecutor's comment about "not picking the witnesses" was merely responding to defense counsel's argument.

The Court agrees with Mitchell that the first four comments by the prosecutor discussed above were improper, but finds that the remaining remarks (*i.e.*, those which appellate counsel raised for the first time on direct appeal) were not improper. The Court now turns to an assessment of whether the improper conduct resulted in actual and substantial prejudice to petitioner, so as to create due process violation, by considering them in light of the following three factors:"(1) the severity of the misconduct, (2) the nature of curative measures taken to remedy the prejudice, if any, and (3) the certainty of the conviction absent the improper conduct."

*Bentley v. Scully*, 41 F.3d at 823 (internal quotation marks and citation omitted); *United States v. Modica*, 663 F.2d at 1181.

Although the first four comments by the prosecutor discussed above were improper, the Court does not recommend finding that reversal of Mitchell's conviction is warranted. On the whole, the misconduct was not severe–it was confined to a few instances during summation and did not pervade the trial. In addition, the trial court took prompt appropriate curative measures: With regard to the first comment, the trial court sustained defense counsel's objection and instructed the jury to disregard the comment. With regard to the other three comments, the trial judge gave adequate curative instructions to the jury specifically addressing each issue. Then, during his general charge, the trial judge instructed the jury that the arguments of counsel were not evidence in the case. The prompt curative instructions given by the trial court thereby mitigated any possible prejudice from the prosecutor's remarks. Finally, the evidence against Mitchell was extremely compelling, and the Court is convinced of the "certainty of conviction" even absent the prosecutorial impropriety. In sum, it appears clear to this Court that the prosecutor's comments, although ill-advised, did not "undermine the jury's ability to view the evidence fairly and free from passion and prejudice." *United States v. Biasucci*, 786 F.2d at 515. Because Mitchell has not demonstrated that the prosecutor's remarks resulted in "substantial prejudice," he cannot show that a due process violation occurred at his trial sufficient to warrant federal habeas relief. Accordingly, the Court recommends dismissal of Mitchell's claim of prosecutorial misconduct.

**Ground Five:        Ineffective Assistance of Trial Counsel**

Mitchell contends that his trial counsel failed to provide effective assistance in violation

of his Sixth Amendment rights under the Constitution by allowing an allegedly partial juror,

Juror No. 5 (Ms. Misso), to remain seated on the jury panel. Mitchell raised this claim in his *pro se* supplemental appellate brief on direct appeal; the Appellate Division summarily dismissed it

as "without merit." This holding by the Appellate Division constitutes an "adjudicat[ion] on the

merits," 28 U.S.C. § 2254(d)(1), for purposes of AEDPA. *See Jenkins v. Artuz*, 294 F.3d 284,

291 (2d Cir. 2002) (concluding that the words "without merit" constituted an adjudication on the

merits for purposes of AEDPA); *Sellan v. Kuhlmann*, 261 F.3d 303, 314 (2d Cir. 2001)

(concluding that the Appellate Division's statement that petitioner's "ineffective assistance of

counsel claim was denied" constituted an adjudication on the merits).

The Supreme Court has recognized that the Sixth Amendment's guarantee of "the right to

counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S.

668, 686 (1984) (setting forth the "clearly established" legal principles applicable to claims

alleging ineffective assistance of counsel under the Sixth Amendment) (quoting *McMann v.

Richardson*, 397 U.S. 759, 771, n. 14 (1970)). To fulfill *Strickland*'s rigorous two-prong

standard, the petitioner first "must show that counsel's representation fell below an objective

standard of reasonableness." The Supreme Court has explained that "[j]udicial scrutiny of

counsel's performance must be highly deferential, and a fair assessment of attorney performance

requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct

the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time." *Id.* at 689. Second, the petitioner must show that counsel's performance

"prejudiced" the petitioner. That is, the petitioner must "show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Id.*

Pursuant to the Sixth and Fourteenth Amendments, a criminal defendant is guaranteed the right to an impartial and unbiased jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process.") (citations omitted); *see also United States v. Nelson*, 277 F.3d 164, 201 (2d Cir. 2002) (The right to trial before an impartial trier of fact-be it a jury or a judge-therefore implicates Due Process as well as Sixth Amendment rights."). Under the Sixth Amendment, the Supreme Court standard for determining juror impartiality long has been as follows: "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723  (1961) (citations omitted).

Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Trial counsel is "accorded particular deference when conducting *voir dire*[,]" and "[a]n attorney's actions during *voir dire* are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) (citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997) (citing *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995)); *accord Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004), *rehearing* en banc *denied*, (6th Cir. 2005).  "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes*, 258

F.3d at 457 (citation omitted); *accord Miller*, 385 F.3d at 672-73.

Similar deference is accorded to the trial court's management of jury *voir dire*. *Hughes*, 258 F.3d at 457 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 423 (1991)). Once the proper questions have been asked of the jurors at *voir dire*, "[t]he trial court, when impaneling a jury, 'has . . . broad discretion in its rulings on challenges therefor.'" *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (quoting *Haynes*, 398 F.2d 980, 984 (2d Cir. 1968) (quoting *Dennis v. United States*, 339 U.S. 162, 168 (1950)). This "broad discretion" exists "because a finding of actual bias 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.'" *Id*. (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985) and citing *United States v. Ploof*, 464 F.2d 116, 118 (2d Cir.1972)). However, the "broad discretion," *Mu'Min*, 500 U.S. at 423, afforded to trial counsel and the trial court in conducting jury selection is nevertheless "subject to essential demands of fairness." *Hughes*, 258 F.3d at 457 (quotations and citation omitted), for a defendant's Sixth Amendment right to an impartial jury is at stake, *id.* Challenges for cause, which are the principal means of implementing this right, "must be based on a finding of actual or implied bias." *Id.* at 458 (quotation omitted); *see also Murphy v. Florida*, 421 U.S. 794, 800 (1975). "Actual bias is 'bias in fact'–the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d at 43 (citing *United States v. Wood*, 299 U.S. 123, 133 (1936)); *see also Murphy*, 421 U.S. at 800  (explaining that a juror is not impartial if there actually exists "an opinion in the mind of the juror as will raise the presumption of partiality") (quotation omitted). Actual bias can be found where a prospective juror admits partiality, or where the same can be inferred from his or her answers to *voir dire* questions. *See Torres*, 128 F.3d at 43.

-33-

Thus, to prevail upon his claim that trial counsel was ineffective in failing to remove or challenge a biased juror, a petitioner "'must show that the juror was actually biased against him.'" *Hughes v. United States*, 258 F.3d at 458 (quoting *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995) (citing *Smith v. Phillips*, 455 U.S. at 215). Here, the conduct about which Mitchell complains is that trial counsel failed to strike juror who alleged was biased because she personally knew one of the police officers who testified for the prosecution. The issue arose not at *voir dire* but on the last day of the proofs, after the prosecution rested. Juror Five (Linda Misso), after seeing him Det. Stambach testify that day, realized that she knew him. The following colloquy ensued:

| | |
|---|---|
| The Court: | Linda Misso, you indicated to, I think it was one of the deputies, that you knew Mark Stambach. |
| Juror Number Five: | Yes. I didn't know what his last name was before, so that's I didn't recognize him before he came in the room. |
| The Court: | How do you know him? |
| Juror Number Five: | Umm, a friend of mine works for UPS, and he works with her, and I've, you know, gone out different parties and things like that. Like I said, I didn't realize what his last name was. |
| The Court: | I see. Well, before he testified did you have any impression about his credibility? |
| Juror Number Five: | He's talked about different cases that he's handled, and I feel that he's capable of his job. |
| The Court: | You had this impression or belief before he testified? |
| Juror Number Five: | Right. |
| The Court: | Okay. Okay. . . . (Juror Number Five excused.) |
| The Court: | Anything else? |
| Mr. Belling: | Judge, I would think that the appropriate inquiry of the juror would be given the fact that she now discovers she has prior knowledge of Detective Stambach, would that in any way affect her ability to follow the Court's charge and remain fair and impartial to the case. |
| Mr.Abbate: | I agree, your Honor. |
| The Court: | All right. . . . [W]ould you bring her in again? |
| . . . | |

-34-

| | |
|---|---|
| The Court: | The suggestion is I ask you [Juror N. 5] the following, and I will. Given the fact that you now realize that this is a person you know, could you, at this point, follow the Court's charge and remain fair and impartial in this case? |
| Juror Number Five: | Umm, I think so, but I – I – I don't want to guarantee anything. |
| The Court. | Okay. Either of you want to ask Linda Misso any questions? |
| Mr. Belling: | No, I don't have any questions. Thank you. |
| The Court: | Mr. Abbate [defense counsel]? |
| Mr. Abbate: | No questions. |

T.251-53. The juror was dismissed from the courtroom momentarily. Both defense counsel and

the prosecutor stated "yes" unequivocally to the trial court's question, "In other words, [ ] both

sides wish her to continue to sit?" T.254. The trial court then recalled Juror Five and informed

her that both sides wished her to continue to deliberate. The judge asked her "not to talk about

what [they]'ve talked about here or [her] familiarity with Mr. Stambach at all." The proceeding

recessed for the day.

After the charge conference the following morning, the trial judge spoke with defense

counsel and petitioner on the record:

| | |
|---|---|
| The Court: | Now, I think we should also add that you – I – I notice that you [defense counsel] did confer with your client before deciding to keep Juror Number Five yesterday, is that true? |
| Mr. Abbate: | That's true. |
| The Court: | Okay. And you haven't changed – you or your client haven't changed your position in that regard? |
| Mr. Abbate: | Let me check with him. |
| (Discussion off the record.) | |
| Mr. Abbate: | No, we haven't changed our mind. |
| The Court: | Is that true, Mr. Mitchell? |
| The Defendant: | Yes. |
| The Court: | All right. We will have Juror Number Five continue to sit. |

T.274-75.  Several factors present in Mitchell's case convince the Court that Juror Five was not

-35-

"actually biased" against petitioner, that trial counsel was not "objectively unreasonable" in keeping Juror Five on the *petit* jury, and that it was not an "objectively unreasonable" application of *Strickland* for the Appellate Division to deny as without merit Mitchell's ineffective assistance of trial counsel claim.

As an initial matter, the Court is not persuaded that, given the above-quoted excerpts of Juror Five's statements and the responses of counsel and the judge,  Mitchell has proved "actual bias" against petitioner under applicable Supreme Court precedent. Even when a juror expressly doubts his or her impartiality on *voir dire*, a finding of actual bias is not necessarily compelled. *Hughes*, 258 F.3d at 458 ("The Supreme Court has upheld the impaneling of jurors who had doubted, or even disclaimed outright, their own impartiality on *voir dire*.") (citing *Patton v. Yount*, 467 U.S. 1025, 1029-30, 1032 (1984)).  In *Patton*, eight of the fourteen jurors in question admitted that, as a result of massive pretrial publicity regarding the crime, "at some time [prior to trial] they had formed an opinion as to [defendant's] guilt." *Patton*, 467 U.S. at 1029-30. In addition, one of the sworn jurors (Juror Hrin), whom defense counsel had challenged for cause, stated at *voir dire* that he would have required evidence to change his mind about [defendant's] guilt." *Id.* at 1030-31; *see also id.* at 1048-49 (Stevens, J., dissenting) ("Q: But you would not change your mind [about your opinion of defendant's guilt] until the facts were presented? A. Right.") (quotation omitted).  Although Juror Hrin stated that he could "enter the jury box with an open mind prepared to find your verdict on the evidence," he had first stated that "'[i]t would be rather difficult . . . to answer' whether he could enter the jury box presuming [defendant's] innocence." *Id.* at 1050 (Stevens, J., dissenting) (quotation omitted).   The Supreme Court found that the trial court did not commit "manifest error" when finding that the jury as a whole was

impartial. *Id.* at 1032. Furthermore, the Supreme Court found that with regard to the three jurors whom petitioner unsuccessfully challenged for cause (including Juror Hrin) there was "fair support in the record for the state courts' conclusion that the jurors would be impartial," noting that the testimony of each was "ambiguous and at times contradictory." *Id.* at 1038-39.

In Mitchell's case, Juror Five, Ms. Misso, did *not* state that she did not think she could be fair.[13] Further, it appears that Juror Misso may have misunderstood the trial court's question, which referred to her assessment of Det. Stambach's *credibility* as a police officer; the juror's answer did not address his credibility but rather was phrased terms of her belief in Det. Stambach's *ability* to do his job. When asked if she could "follow the [trial] court's charge and remain fair and impartial in this case," Juror Five responded, "I think so." The fact that this juror

---

[13]     *Compare with Hughes*, 258 F.3d at 456. Petitioner Hughes was charged with theft of government property and wrongful possession of a firearm in connection with the robbery of a federal marshal. He contended that trial counsel was ineffective in failing to strike a juror who stated the following on *voir dire*:

> JUROR [Jeanne Orman]: I have a nephew on the police force in Wyandotte, and I know a couple of detectives, and I'm quite close to 'em.
> THE COURT: Anything in that relationship that would prevent you from being fair in this case?
> JUROR: I don't think I could be fair.
> THE COURT: You don't think you could be fair?
> JUROR: No.
> THE COURT: Okay. Anybody else? Okay. Where did we leave off?

*Id.* Hughes claimed that he requested that trial counsel remove this juror for cause but this was ignored. Hughes' trial counsel asked no follow-up questions after this blatant statement by the juror that she did not think she could be fair and did not exercise a peremptory challenge on the juror. He did, however, ask the jury pool in general whether they could be impartial in light of petitioner Hughes' prior criminal convictions, and if they would attach added credibility to the testimony of police officers. The juror in question did not respond to either inquiry or to the court's group inquiry as to whether, given that Hughes was to be viewed as having a "clean slate," they could find him not guilty prior to trial. Hughes' counsel challenged two other jurors for cause, but declined the court's invitation to challenge any others, and did not use up his full allotment of peremptory challenges. The Sixth Circuit held that "while a juror's express doubt as to her ability to be partial on *voir dire* does not necessarily result in a finding of actual bias, *actual* bias was present because neither counsel nor the trial court responded to the juror's express statement that she could not be fair," and "[t]here was no subsequent assurance of impartiality and no rehabilitation by counsel or the court through follow-up questions." *Miller v. Webb*, 385 F.3d at 674 (citing *Hughes v. United States*, 258 F.3d at 460). As a result of this finding of actual bias, the Sixth Circuit in *Hughes* held that the state court's denial of petitioner's ineffective assistance of counsel claim was an "unreasonable application of clearly established federal law." *Id.*

couched her response in terms of "I think" does not amount to equivocation as jurors commonly respond to questions concerning bias in those terms. *See Miller*, 269 F.3d at 618. Juror Five's follow-up statement that she did not "want to guarantee anything" did concern the Court somewhat. However, after reviewing the context of the questions and responses, the Court does not believe that the record compels an inference of actual bias on the part of Juror Five against Mitchell. It is not surprising for a layperson, unused to the language of the law, to express some hesitation when asked to make such a promise of impartiality. Rather, it appears to reflect an acknowledgment of the notion that it is extremely difficult, if not impossible, for human beings to know whether they are, in fact, acting with perfect objectivity. In light of the record before the Court, Mitchell has not carried his burden of demonstrating that Juror Five's assurance of impartiality should not be credited.

Without a finding that Juror Five was actually biased against petitioner, prejudice under *Strickland* is not presumed. *Cf. Hughes*, 258 F.3d at 463 ("The 'presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.'" *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (citations omitted). Accordingly, given that a biased juror was impaneled in [Hughes'] case, prejudice under *Strickland* is presumed . . . ."). Thus, the Court turns to the question of whether defense counsel's decision not to challenger Juror Five for cause constituted a reasonable trial strategy. At the time Juror Five was initially questioned by the judge regarding her acquaintance with Det. Stambach, defense counsel discussed the issue with petitioner. This was established in the colloquy placed on the record the following day in which the trial judge noted that defense counsel had conferred with his client about "deciding to keep Juror Number Five yesterday[.]" During that second colloquy, when the

trial judge asked whether that decision still stood, defense counsel had an off-the-record discussion with Mitchell and confirmed that they wished to keep Juror Five. The trial judge then addressed Mitchell separately and Mitchell expressly confirmed that he agreed with the decision to have Juror Five continue to sit on the jury. Thus, as the record demonstrates, petitioner participated in the decision to keep Juror Five and specifically assented to trial counsel's strategy in this regard.

Under the particular facts of this case, the Court concludes that Mitchell has not shown that Juror Five harbored an actual bias against him and therefore cannot demonstrate prejudice. Furthermore, Mitchell has failed to demonstrate an absence of legitimate trial strategy in trial counsel's decision to keep Juror Five as an impaneled juror, and the Court accordingly cannot find that trial counsel's performance was objectively unreasonable. Therefore, since the state courts' rejection of Mitchell's ineffective assistance of counsel claim was not an unreasonable application of *Strickland*,[14] the Court recommends that this claim be denied.

---

[14]     *Compare also with McCullough v. Bennett*, 143 Fed. Appx. 379, 381, 2005 WL 1901533, at *2 (2d Cir. Aug. 10, 2005) (unpublised opn.) (reversing grant of habeas corpus by district court), 546 U.S. 1079 (2005), *rehearing denied*, 546 U.S. 1211 (2006). In that summary order, the Second Circuit held that the state court's determination that petitioner was not denied effective assistance of counsel due to trial counsel's failure to challenge juror who indicated that he could not be fair and impartial was not contrary to, and did not represent unreasonable application of clearly established federal law under *Strickland v. Washington*, and thus did not warrant federal habeas relief. The Second Circuit found that the juror's recorded response of "No" to question about whether he could be impartial was anomalous, as none of the juror's other answers during *voir dire* reflected any bias whatever. Rather than faulting trial counsel for not following up on the juror's statement that he could not be impartial, the Second Circuit held that because the statement went unnoticed by the prosecutor, defense counsel, and the trial judge, it "was at least as likely to be a slip of the tongue, or a mistranscription, as a genuine indicator of partiality." 143 Fed.Appx. at *380-81, 2005 WL 1901533, at **1-2. The Second Circuit in *McCullough* specifically distinguished the Sixth Circuit's decision in *Hughes v. United States. Id.*, 2005 WL 1901533, at **2 n. 1. Therefore, the Second Circuit held that "[u]nder the unique circumstances of this case," it was "unable to say that the state court's decision to deny McCullough's ineffective assistance claim was contrary to or involved an unreasonable application of clearly established federal law" or "that it was based on an unreasonable determination of the facts in light of the evidence." *Id.*, 2005 WL 1901533, at **2.

**V.      Conclusion**

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by Emmanuel Mitchell be **DENIED**. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). Therefore, the Court recommends that no Certificate of Appealability should issue with respect to any of petitioner's claims.

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  November 20, 2007
        Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  Buffalo, New York
      November <u>20</u>, 2007.